G. Lynn Shumway (011714)
shumway@carsafetylaw.com
**SHUMWAY LAW PLLC**
4647 N. 32nd Street, Suite 230
Phoenix, Arizona  85018
Telephone : 602.795.3720
Facsimile  : 602.795.3728

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| **John Armstrong**, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>**General Motors, LLC**, a Delaware limited liability company; and<br>**Isuzu Motors Ltd.,** a Japanese corporation.<br><br>Defendant. | No. _____<br><br>**COMPLAINT**<br><br>(Jury Trial Demanded) |

Plaintiff John Armstrong submits his Complaint against Defendants as follows:

**Parties**

    **A.**    **Plaintiff John Armstrong**

1. Plaintiff John Armstrong is an individual, a resident of Maricopa County, Arizona.

2. He is a citizen of the United States. He is also a citizen of the State of Arizona. The State of Arizona is his state of domicile.

3. He has lived in Arizona on a permanent basis for many years and intends to continue to reside and domicile in the State of Arizona on a permanent basis.

4. Mr. Armstrong was a passenger in a small truck, a model year 2000 GMC W3500, vehicle identification number 4LDB4B1R8YJ805820 (the "Vehicle" or "Truck").

### B. Defendant General Motors LLC

5. Defendant General Motors LLC ("General Motors" or "GM") is a foreign limited liability company organized and formed under the laws of Delaware, doing business in Arizona.

6. General Motors' principal place of business is the State of Michigan.

7. According to General Motors' Corporate Disclosure Statement filed in other matters before this Court:

> General Motors LLC is a Delaware limited liability company with its principal place of business in Michigan. General Motors LLC is 100% owned by General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in Michigan. General Motors Holdings LLC is 100% owned by General Motors Company. General Motors Company is a Delaware corporation with its principal place of business in Michigan.

8. The members/owners of Defendant General Motors LLC are citizens and residents of Michigan and/or Delaware.

9. None of the members or owners of Defendant General Motors LLC are citizens or residents of the State of Arizona.

10. General Motors LLC is and has been engaged in the design, manufacture and sale of automobiles and trucks through a nationwide network of subsidiaries and dealerships doing business in the State of Arizona.

11. As used herein, General Motors includes all predecessor corporations and entities.

12. At the time of manufacture of the Truck, General Motors LLC manufactured its vehicles through a predecessor entity, General Motors Corporation.

13. Upon information and belief, the Truck was manufactured at General Motors' Janesville, Wisconsin, manufacturing plant.

### C. Defendant Isuzu Motors Ltd.

14. Defendant Isuzu Motors Ltd. ("Isuzu") is a foreign corporation organized under the laws of Japan.

15. Isuzu's principal place of business is the country of Japan.

16. Isuzu is neither incorporated in Arizona, nor does it have its principal place of business here.

17. Isuzu is and has been engaged in the design, manufacture and sale of automobiles and trucks throughout the world. It had a nationwide network of subsidiaries and dealerships doing business in the State of Arizona.

18. As set forth in greater detail below, Isuzu also manufactured trucks as part of a joint venture with General Motors.

### D.     The General Motors/Isuzu Joint Venture

19. General Motors and Isuzu have had a close business relationship, including various joint ventures, that has extended nearly five decades.

20. In 1971, General Motors purchased approximately a 34.2% interest in Isuzu.

21. Since then General Motors and Isuzu have engaged in numerous joint ventures and projects.

22. One such joint venture is the Isuzu Elf truck. The Isuzu Elf is a medium duty truck manufactured by Isuzu since 1959.

23. The fifth generation of the Isuzu Elf truck was introduced in July of 1993.

24. This fifth generation Elf was introduced into the United States as part of the joint venture between General Motors and Isuzu.

25. In the United States, General Motors marketed the vehicle under the trade names of Chevrolet and GMC, each designated as part of the "W series" of trucks.

26. The 2000 GMC W3500 at issue in this matter was one of the trucks manufactured and distributed in the United States as part of this joint General Motors/Isuzu joint venture/partnership.

27. This photograph shows an exemplar 2000 GMC W3500:



## Jurisdiction and Venue

28. This Court has jurisdiction of the parties and subject matter.

29. As set forth above, the parties are diverse. The amount in controversy exceeds $75,000. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

30. Venue is proper in this Court.

## Factual Background

### A. Background

31. Plaintiff John Armstrong is a trooper with the Arizona Department of Public Safety, Highway Patrol ("DPS").

32. He is a canine officer with the DPS.

33. At the time of the collision at issue, the Truck was owned by the State of Arizona and assigned to the Department of Public Safety.

### B. The Collision

34. On February 8, 2018, Trooper Armstrong was a passenger in the Truck, transporting dog food and other supplies.

35. The truck was traveling southbound on Interstate 17.

36. Armstrong was properly restrained with his seat belt.

37. At milepost 334, another vehicle struck the rear of the Truck.

38. As a result of this collision, the driver of the Truck, another DPS employee, lost control of the Truck.

39. The Truck rolled over.

40. This photograph shows the final resting place and damage to the Truck following the collision:



41. Although he was properly restrained, Armstrong's right leg was forced outside the protection of the cab during the course of the collision.

42. As a result, Armstrong sustained a serious, open fracture and extensive disruption of the soft tissues of his lower right leg.

43. Armstrong's injuries are permanent and disabling. He can no longer walk normally. He has significant disfigurement of his leg.

5

### C. Defendants' Role in Plaintiff's Injuries

44. There are five (5) recognized crashworthiness principles in the automobile industry/throughout the world. They are as follows:

    a. Maintain survival space;

    b. Provide proper restraint throughout the entire accident;

    c. Prevent ejection;

    d. Distribute and channel energy; and

    e. Prevent post-crash fires.

45. When the National Highway Traffic Safety Administration (NHTSA) created the Federal Motor Vehicle Safety Standard (FMVSS) in the late 1960's, the preamble to the safety standards included a crashworthiness definition similar to that used above, "that the public is protected against unreasonable risk of crashes occurring as a result of the design, construction, or performance of motor vehicles and is also protected against unreasonable risk of death or injury in the event crashes do occur."

46. The National Transportation Safety Board (NTSB) has also stated that, "Vehicle crashworthiness refers to the capacity of a vehicle to protect its occupants from crash forces. This protection—which is achieved, in part, by vehicle structure—includes maintaining a survival space around the occupant, retaining the occupant within that space, and reducing the forces applied to the occupant."

47. Crashworthiness safety systems in a vehicle must work together like links in a safety chain. If one link fails, the whole chain fails. For example, in a rollover, if the roof collapses such that no survival space is left, it does not matter what kind of restraint system, glass, fuel system, or energy absorbing system is used, because these systems have been rendered moot.

48. Vehicle manufacturers have known for decades and have admitted under oath that there is a distinction between the cause of the accident versus the cause of an injury.

Indeed, vehicle manufacturers have known for decades that crashworthiness is the science of preventing or minimizing injuries or death following an accident using a vehicle's structure and various safety systems.

49. Because every American has the right to a safe vehicle, because safety is for all, and because technologies for meeting the goal of zero injuries and fatalities are basically known today, it is incumbent upon auto manufacturers to investigate and find out what other automakers are doing with regards to safety and to apply those same methods or technology to their own vehicle.

50. Furthermore, an automaker cannot choose to use safer technology in Europe, Australia, Japan, or some other country and refuse or fail to offer that same safety technology to consumers in America.

51. While there are minimum performance standards which an automaker is supposed to meet before selling a vehicle in the United States (the FMVSS), these minimum performance standards to not adequately protect the public.

52. With respect to the present collision, the Truck was defective and unreasonable dangerous. Upon information and belief, the welds holding the roof to the roof rails or frame and the other structure of the cab Mr. Armstrong was in failed.

53. These photographs demonstrate the failure of these welds and the structure of the occupant compartment around Mr. Armstrong:





54. The roof and roof frame integrity were unreasonably dangerous and defective.

55. Further, upon information and belief, the windows of the Truck were also unreasonably dangerous and defective. Trooper Armstrong's leg may have been forced outside the Truck during the collision through the passenger side tempered glass window. If so, the glass was defective and failed to protect the occupant of the Vehicle.

56. Alternately, Armstrong's leg may have been forced out of the Truck through the windshield area. During the collision, the A-pillar deformed in such a manner that created an opening between the pillar, roof frame, and windshield, mooting any benefits from the laminated glass windshield.

57. Upon further information and belief, the passenger side restraint system was also unreasonably dangerous and defective. The seat belts failed to restrain Armstrong and keep him inside the Vehicle.

58. The Vehicle also did not have side curtain airbags that would have prevented Armstrong's leg from going outside the Vehicle during the collision.

59. Defendants will likely allege that the driver of the vehicle that struck the Truck is partially at fault for Plaintiff's injuries.

60. Under the rule of *Piner v. Superior Court In & For County of Maricopa*, 192 Ariz. 182 (1998), Defendants bear the burden of apportioning any injuries between them and the driver of the bullet vehicle. Further, to the extent that the injuries arose primarily due to the defective design of the Truck and, as such, the injuries cannot be apportioned, "there is no reason why those whose conduct produced successive but indivisible injuries should be treated differently from those whose independent conduct caused injury in a single accident," *id*. at 189 ¶ 27, and Defendants are responsible for all the injuries.

## Claims For Relief

## Count 1

## Products Liability—Design Defect

61. Plaintiff hereby incorporates by this reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

9

62. It was entirely foreseeable to and well-known by Defendants that accidents and incidents involving its vehicles, such as occurred herein, would take place during the normal and ordinary use of said vehicle.

63. The injuries complained of occurred because the Truck was not reasonably crashworthy, and was not reasonably fit for clearly foreseeable, accidents. The vehicle in question was unreasonably dangerous in the event it should be involved in an incident such as occurred herein.

64. In addition to the foregoing, Defendants, either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or tested the Truck to be unreasonably dangerous and defective within the meaning of Section 402(A) Restatement (Second) Torts, in that the Truck was unreasonably dangerous as designed, manufactured, assembled, marketed, and/or tested because Defendants knew and/or should have known of the following, non-exhaustive list of defects:

    a. The Truck failed to provide reasonable occupant protection;

    b. The Truck failed to provide reasonable occupant safety;

    c. The Truck's roof and cab frame lacked structural integrity;

    d. The Truck's passenger side window failed to prevent occupants and occupant body parts from exiting the Truck during collisions;

    e. The Truck's frame around the windshield also lacked structural integrity;

    f. The Truck's passenger side restraint system did not keep passengers inside the Truck during collisions; and

    g. The Truck did not have a side impact airbag system.

65. In designing a vehicle, efforts should be made by manufacturers to identify potential risks, hazards, and/or dangers that can lead to serious injury or death;

66. Once potential risks, hazards, and/or dangers are identified, then the potential risks, hazards, or dangers should be eliminated if possible.

67. If the potential risks, hazards, and/or dangers can't be eliminated, then they should be guarded against.

68. If the potential risks, hazards, and/or dangers can't be eliminated or guarded against, they should at least be warned about.

69. Based upon information and/or belief, Defendants either used or knew about advanced safety features used in Europe, Australia, Japan and some other country and chose not to offer those safety features to American consumers.

70. Defendants' occupant protection philosophy and design philosophy are utilized in various model vehicles, including ones sold overseas in other markets.

71. When Defendants designed the subject vehicle, they did not reinvent the wheel. Defendants used an enormous amount of human capital which had been acquired from numerous different engineers which had worked on many prior vehicles. This knowledge would have been utilized in different aspects of the various designs of the subject vehicle.

72. Defendants are currently in exclusive possession and control of all the technical materials and other documents regarding the design, manufacture, and testing of the vehicle in question. Defendants are also in possession of what, if any, engineering analysis they performed.

73. It is expected that after all these materials are produced in discovery and/or after Defendants' employees and corporate representatives have been deposed, additional allegations may come to light.

74. Lastly, the materials from other models, years, and countries will provide evidence regarding what Defendants knew, when they knew it, and about what was utilized or not utilized as well as the reasons why.

75. The harmful characteristics or consequences of the Vehicle's design negatively outweighs any benefits from the design.

76. Further, a reasonable consumer would not expect (1) the frame of the cab to collapse, enabling restrained persons to have body parts forced outward, (2) the restraint system fail to prevent full or partial expulsion from a vehicle, or (3) windows fail to prevent expulsion, in a collision with the severity involved in this collision.

77. As a direct and proximate result of the design defects alleged herein, Plaintiff suffered serious and permanent injuries, including economic losses, pain and suffering, and loss of enjoyment of life.

**Count 2**

**Product Liability – Manufacturing Defect**

78. Plaintiff hereby incorporates by this reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

79. The Truck, as manufactured, distributed, and sold by Defendants, was unreasonably dangerous due to defectively manufactured cab frame, windows, structure, and restraint systems.

80. As a direct and proximate result of the manufacturing defects alleged herein, Plaintiff suffered serious and permanent injuries, including economic losses, pain and suffering, and loss of enjoyment of life.

**Count 3**

**Negligence**

81. Plaintiff hereby incorporates by this reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

82. Defendants, as manufacturers of vehicles for public distribution and sale, had and has a duty of care to make vehicles that are reasonably safe.

83. A company that does not conduct a proper engineering analysis that would help it to identify potential risks, hazards, and/or dangers that could seriously injure someone is negligent,

84. Defendants breached this duty of care in the unreasonable design and/or unreasonable manufacture of the Truck.

85. As a direct and proximate result of the manufacturing defects alleged herein, Plaintiff suffered serious and permanent injuries, including economic losses, pain and suffering, and loss of enjoyment of life.

## Prayer For Relief

**WHEREFORE**, Plaintiff John Armstrong prays for damages against Defendants General Motors, LLC, and Isuzu Motors, Ltd., as follows:

1. For special damages, including but not limited to medical fees and expenses.
2. For other general damages, including lost income, pain and suffering, medical expenses, cost of care, loss of enjoyment of life.
3. For taxable costs and pre- and post-judgment interest to the extent permitted by law.
4. For exemplary damages to the extent permitted by law.
5. For attorney's fees and expenses to the extent permitted by law.
6. For other relief as the Court deems just and proper.

## Jury Demand

Plaintiff respectfully requests a trial by jury on all issues triable to a jury.

DATED this 6th day of February, 2020.

**SHUMWAY LAW PLLC**

/s/ G. Lynn Shumway
G. Lynn Shumway
*Attorney for Plaintiff*